## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CLIFTON MURIE,
     Plaintiff,

v.

NORTHWESTERN MICHIGAN COLLEGE,
NMC BOARD OF TRUSTEES,
JIM WHITE, PAUL KOLAK, TONY JENKINS,
TODD NEIBAUER, LEANNE BAUMLER,
MARCUS BENNETT, and
CHAD SCHENKELBERGER,
     Defendants.

Case No.:     22 – cv -  1054

Hon.:

Collin H. Nyeholt (P74132)
LAW OFFICES OF CASEY D.
CONKLIN, PLC
Attorneys for the Plaintiff
4084 Okemos Road, Ste B.,
Okemos, MI 48823
Phone: (517) 332-3390
Fax: (517) 853-0434
collin@caseydconklin.com

## COMPLAINT and JURY DEMAND

## STATEMENT OF THE CASE

This lawsuit is the culmination of a longstanding dispute between the Plaintiff, Mr. Clifton Murie, and the powers that be at Northwestern Michigan College. Mr. Murie has, through the years, fought against unlawful suppression of his and others' freedom of speech and political affiliation by the College administration. The College, in response, has labeled Mr. Murie an "agitator" and has taken continuing actions against him to suppress his voice. The College's ongoing hostility and antagonism culminated in its officials' decision to knowingly and intentionally make false statements to the Traverse City Police Department and the Grand Traverse County Prosecutor in order to cause Mr. Murie to be charged with a criminal act. In this suit, Mr. Murie seeks to vindicate his right to be free from malicious prosecution in retaliation for his exercise of his First Amendment Rights.

## PARTIES and JURISDICTION

1.      Plaintiff CLIFTON MURIE maintains a permanent residence in Leelanau County, which is within the jurisdictional bounds of the Western District of Michigan.

2.      Defendant NORTHWESTERN MICHIGAN COLLEGE ("Defendant NMC") is a public community college, organized under MCL § 389.1 *et seq*, that is located in Grand Traverse County.

3.      The Defendant BOARD OF TRUSTEES for NORTHWESTERN MICHIGAN COLLEGE ("NMC BOARD OF TRUSTEES") is the governing body for Defendant Northwestern Michigan College, with the powers and duties proscribed by the Michigan Community College Act, MCL § 389.14 *et seq*.

4.      Defendant JIM WHITE is, and at the time of the events described in the Complaint was, the Director of Security for Defendant NMC with regular place of business within the Western District of Michigan.

5.      Defendant PAUL KOLAK is, and at the time of the events described in this Complaint was, an Administrator for Defendant NMC with regular place of business within the Western District of Michigan.

6.      Defendant TONY JENKINS is, and at the time of the events described in this Complaint was, a faculty member for Defendant NMC with regular place of business within the Western District of Michigan.

7.      Defendant TODD NEIBAUER is, and at the time of the events described in this Complaint was, the Vice President for Student Services and Technologies at Defendant NMC with regular place of business within the Western District of Michigan.

8.      Defendant LEANNE BAUMLER is, and at the time of the events described in this Complaint was, the Disability Support Coordinator for Defendant NMC with regular place of business within the Western District of Michigan.

9.      Defendant MARCUS BENNETT is, and at the time of the events described in this Complaint was, the Associate Dean of Campus Life for Defendant NMC with regular place of business within the Western District of Michigan.

10.     Defendant CHAD SCHENKELBERGER is, and at the time of the events described in this Complaint was, a faculty member for Defendant NMC with regular place of business within the Western District of Michigan.

11.     The Court may exercise general *in personem* jurisdiction over the defendants to this action because of their permanent presence within the geographical bounds of the Court.  In the

alternative, the Court may exercise specific jurisdiction over the dispute because the events giving rise thereto occurred within the Court's geographical bounds.

12.     Venue is properly laid in the Western District of Michigan's Southern Division pursuant to 28 USC §§ 1391(b)(1) and (b)(2).

13.     The Court may exercise Subject Matter Jurisdiction over the claims emanating from federal law pursuant to 28 USC § 1331. The Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367.

## GENERAL ALLEGATIONS

*Background*

14.     Plaintiff enrolled as an academic student at Northwestern Michigan College in the fall of 1984.. In December of 1984, he had a grade dispute within the nursing program. Over several years, he vigorously disputed the grade. The matter turned highly contentious and, at several points, Plaintiff asserted due process violations in the NMC administration's handling of his dispute. In 1989, his experience led him to involve the NMC Student Government Association being involved with a review and revision of the "Due Process System" of NMC.

15.     In 1985, the College cancelled an interview with him for a course proposal that he had submitted for instructing parents in "Infant Massage.". He later learned that the college had sought out and contacted female massage therapists from the community to teach the class he had designed and presented to the college. The Plaintiff proceeded to file an EEOC charge challenging this action as sex discrimination.

16.     In or about 1985, Plaintiff became affiliated with the College's student radio station, WNMC-FM. Eventually; he became WNMC's General Manager and engaged the listing

community for fundraising support. Plaintiff became embroiled in a dispute with administrators about allowing WNMC to apply to the FCC for approval to increase the power and range of the station. The increase had the unanimous support of the WNMC Broadcasting Advisory Board. This board of community professionals was required for the offering of a degree program in broadcasting at the college. Their recommendation and the community's desire was opposed by the Defendant NMC Board of Trustees.

17.     In 1991, administrator Chet Janik threatened, in writing, to terminate any WNMC staff member or student who continued to advocate for the expansion, or to "pull the plug" on the station altogether.. Plaintiff challenged this flagrant violation of his, and others, First Amendment Rights to free speech and affiliation to the college Trustees. The Trustees did not respond or act on his complaint Plaintiff continued to advocate and fundraise for a potential power increase.

18.     On the evening of Jan. 18, 1993, the Plaintiff was removed from his radio show by college security without warning, while it was being broadcast. He was ordered to leave the campus immediately or be arrested. The Plaintiff's weekly radio show was subsequently cancelled and he was banned from the station staff without explanation; and without the benefit of due processes that had been adopted through the station's Constitution.

19.     In a meeting of April 20, 1993, with the college president Tim Quinn and Trustee Robert Chase, held to discuss his ban from WNMC, Plaintiff asked if he did not have the right to freedom of speech. Trustee Robert Chase told him emphatically, "No you don't have that right." Plaintiff was given a permanent suspension and ban from the station in May 1993 by the college president. Plaintiff continued to oppose his unjust suspension and the NMC Administration's general anti-First Amendment practices. On March 24, 1997 the college's legal counsel, Donald

Bonato, attended a closed meeting of the Defendant NMC BOARD OF TRUSTEES to discuss Plaintiff's ongoing contacts with the college and methods of restricting his presence on campus. . That same year, Plaintiff complained to the North Central Association for Colleges and Schools ("NCA"). The NCA's Director wrote Isle Burke, Defendant NMC's President at that point in time, noting that  the plaintiff's complaints boil down to "due process" and suggest NMC may not be in conformance with the organization's criterion that it "demonstrates integrity in its practices and relationships." Plaintiff also submitted letters to the Student newspaper opposing the ongoing suppression of free speech and failures of due process by NMC's administrators and Trustees. He made numerous requests for information through the Freedom of Information Act. At one point, in 1998, NMC retaliated by making a statement to the Traverse City Probation Department in which they described him as an "agitator."

20.     Plaintiff observes that, although WNMC continues to receive student funds as a supposed "student activity," it is really part of NMC's Public Relations and Marketing. In 2002, Plaintiff filed an FCC complaint about deficiencies in WNMC's practices as a non-commercial broadcaster and misrepresentations made during on-air fundraisers.. Tim Nelson, the College President, responded in writing to this investigation that "every time Plaintiff comes to campus, it is a security incident."

21.     The NMC Student Government Association, or "SGA," acts as a conduit between NMC's students, administration and the greater community and seeks to help offer a better education for all and ensure quality and integrity in academia." Given its role as an intermediary between student concerns and the NMC administration Plaintiff has, at various times, directed his various concerns to the SGA.

22.    In November 1, 2004, while serving as a reporter involved in writing a story about the one and one-half year "temporary" appointment of Marguerite Cotto as head of the University Center, the college president ordered the Plaintiff removed from the staff of the college newspaper. This was in violation of the college Student Journalists Rights and Responsibilities policy which promises an "uninhibited, robust, free and open discussion of issues" and "student journalists shall have the right to determine the content of official student publications." Plaintiff filed a discrimination complaint under the college's non-discrimination policy and requested a hearing of the matter. However, college administrator Chuck Shreeve denied Plaintiff this hearing under the excuse that "non-academic students' were not entitled to protections spelled out in the Student Rights and Responsibilities policy. Though both academic and non-academic individuals were tuition-paying members of the student body, only the academic students were to be afforded the safeguards of due process spelled in this document. Plaintiff found this move on the part of the administration to be *extremely* problematic since he learned that this had not been approved through the NMC Policy Council or discussed among college constituencies as is required. This decision was made to frustrate the Plaintiff's request for a hearing regarding his removal from the student newspaper and prevent the reporting of this story to the community,

23.    In 2011, Plaintiff attempted to discover if the SGA had a representative currently seated on the NMC Policy Council. He also made known his desire to attend a meeting of the SGA to discuss his objection to NMC's policy of not allowing non-academic students protections of the college due process system.   NMC Security attempted to block Mr. Murie from attending this meeting. Ignoring their instructions, Plaintiff entered the meeting room. The security staff followed him into the room and threatened his arrest if he did not leave. The Traverse City police were called to respond and Defendant White issued Plaintiff a verbal "No Trespassing order" for

one year. Later, during the hearing required by the one year No Trespassing order issued to the Plaintiff, the college claimed that students were intimidated by his presence at the meeting and the college attorney went so far as to assert, falsely, "the students felt fearful that he was carrying a gun in the paper sack" when he entered the meeting.

24.     On November 8, 2018, Plaintiff visited NMC's president's office to review WNMC's Public Inspection file. He was directed by the President's Assistant, Lynn Moritz, to visit the WNMC offices to see this file. When he entered the WNMC offices the General Manager, Eric Hines, immediately *assaulted* Plaintiff by grabbing him by the arms and shoving him backwards towards the door. Hines stopped when Plaintiff explained that he was there to see the public inspection file upon instructions from the president's office.

25.     Plaintiff reported this assault to the college and was not satisfied with the resulting investigation for several different reasons.

26.     Hines responded by sending a group email to all WNMC staff and volunteers regarding keeping Plaintiff out of the WNMC studios and the building these studios were located within. Plaintiff later complained about the assault to NMC's Trustees at an open meeting. He also filed a police report about the incident with the Traverse City Police Department.

27.     On Dec. 12, 2018, the Plaintiff contacted Trustee Chairman Kennard Weaver by email and again complained that his 1993 removal from WNMC was done without due process Plaintiff complaining that his exclusion was done in response to constitutionally protected activity and speech.

28.     On Jan 11, 2019, -President Tim Nelson emailed the Plaintiff and informed him the "restrictions established by NMC that previously applied to you are no longer in effect."

29.     On February 14th of 2019, the Plaintiff applied to be a volunteer once again at WNMC. His volunteering was refused by Gen. Manager Eric Hines.

30.     Defendant NMC maintains student bulletin boards. Individuals are able to post information and political messages in the bulletin boards, so long as they observe the poster policy's limitations on the size and number of such posters they place on the bulletin boards and observe certain criteria such as indicating the sponsoring entity, contact information and the date of the posting. This poster policy's recent revision now also provides for penalties of trespassing be imposed for the improper removal of posted items.

31.     Plaintiff responded to the discovery of Mr. Hine's group email and this continuing *defacto* ban from the station by posting a satirical "Wanted" poster on NMC's public bulletin boards as a protest of the decision to exclude him as a volunteer and his instruction that volunteers treat him as a threat**.**

32.     In March of 2019, after being refused as a volunteer at WNMC, and after discovering emails from administrators discussing himself and needed changes to the college's volunteer policies, the plaintiff  contacted the SGA president, Emily Perkins, by both phone and email, requesting to attend an SGA meeting to discuss volunteer guidelines at NMC, to question the continued payment of student funds to support WNMC, to discuss campus issues related to campus bulletin boards, discrimination, freedom of speech, and FERPA. Ms. Perkins failed to reply or respond to Mr. Murie's several requests.

33.      By NMC's policy, the bulletin boards may be used for posting commercial, political and personal notices, subject to certain terms within the policy.  The plaintiff's posters conformed to the policy requirements; Since the "Wanted" posters sought to lampoon NMC's continued exclusion of Plaintiff from the radio station, his posters were protected as  a matter of free speech.

34.      Plaintiff observed, and was informed, that his posters were being repeatedly removed by college security staff.

### The 2019 Lawsuit

35.      On April 1, 2019, the Plaintiff went to the college President's office, to complain about the removal of his posters and inquire about accessing the college's archives. He spoke to Holly Gorton, and the conversation was witnessed by several others. The video of this interaction has been preserved and indicates no signs of alarm or distress by the staff, and no indication of any improper or threatening conduct by Plaintiff. Indeed, there were none. Yet, NMC's administration responded to his complaint by calling the Traverse City Police Department and discussed the issuance of a "No Trespassing "order.

36.      On April 5th the Plaintiff, enrolled as a non-academic student, was preparing to attend the weekly SGA meeting when Defendant Jim White and Traverse City police officers informed him that a 90 day "no trespass order" was being issued to him verbally and he was to leave campus or be arrested. The reason stated was the disruption of college activities on April 1st.  A written order was sent to the plaintiff on April 8th.

37.      Plaintiff, acting as a *pro per*, proceeded to file a suit in the State of Michigan 13th Circuit Court, alleging First Amendment violations from (1) the removal of his "wanted" posters and (2) the issuance of the no-trespassing order to prevent him from addressing the SGA. The matter was assigned case number 2019034862-AW and heard before the Honorable Kevin A. Elsenheimer, State of Michigan Circuit Judge. The case was dismissed by the Plaintiff on May 21, 2019, after the college attorneys agreed to re-post his posters where they had been removed.

38.      The April 2019 three-month no trespassing Order concluded in or about July of 2019.

*The 2019 Trespassing Charge*

39.     As of October 23, 2019 Murie was registered for a single class at NMC, "How to Start a Nonprofit." NMC staff repeatedly refused his requests to be provided information about contacting the SGA or their place and time of meeting.

40.     On Nov. 1, 2019, the NMC SGA acted upon the advice of "the college attorney" to revise their Constitution and eliminate all non-academic students' ability to attend an SGA meeting or provide public input during their open meetings. No attempt was made to communicate this change with the affected students in violation of the college's  Governance  policy. This policy requires "providing opportunities for review and comment by those who will be directly affected by the policy proposal constituents be informed and provided an opportunity to provide input about the proposed policy change**."**

41.     On November 1ˢᵗ, 2019 Plaintiff, with his father in accompaniment as a witness, arrived at Scholar's Hall to attend a meeting of the SGA at its published time and place of meeting.   and attempted to present his ongoing concerns as he was guaranteed by college policy .

42.      Upon entering the building where the meeting room was located, the plaintiff recognized the three security staff stationed outside the door to the meeting room. When the Plaintiff tried to open the meeting room's door he found the door locked. He knocked once politely and stood outside the room waiting.

43.     After waiting about ten minutes, he was informed by Defendant WHITE that the college had issued a six month "No Trespassing" order against him. But, when the plaintiff asked to be presented with the required written order, Mr. White was unable to provide one.

44.     The Plaintiff then proceeded to contact the Traverse City Police Department and complained that he was being harassed by college security and requested an officer be dispatched.

45.     When the TCPD officers arrived, Officer Bock spoke first with Defendant White privately for several minutes before meeting the Plaintiff. Defendant White had falsely informed him during this conversation that the Plaintiff was "causing a scene and causing students to fear for their safety." Defendant White had also stated that the college had issued a 6 month 'No Trespassing" order against the Plaintiff.

46.     After that conversation the officer addressed the plaintiff and informed him that a "No Trespassing "order had been issued by the college and that he would have to leave campus or be arrested. The Plaintiff protested that such an order was required to be delivered in writing.

47.     When the plaintiff protested that he was a student and allowed to attend the meeting, this officer informed the plaintiff that he been informed by Defendant White that "he was not a student."

48.     The Plaintiff informed the officers that he wanted to go to the registrar's office to get clarification of his student status. He was informed that he would be arrested if he did not leave campus immediately.

49.     The plaintiff was arrested and placed in handcuffs and taken to jail for trespassing as he attempted to go to the registrar's office. His 96 year, disabled, father was left alone and unattended on an unfamiliar campus for several hours.

50.     Defendant White falsely stated to Officer Bock that Plaintiff had been "banging on the door, and ordered to be let in" More importantly; WHITE supported the false and inaccurate assertion that the Plaintiff was not a student and the he was under a no-trespass order at this point

in time. These statements were all untrue, but they caused the Traverse City Police Department to proceed to arrest Plaintiff.

51.     This same date, Defendant PAUL KOLAK authored an email to Defendants WHITE and TODD NEIBAUER which falsely accused Plaintiff of "pounding on the classroom window and rattling the locked door handle" causing students to be "concerned about their guest speakers safety." He also falsely claimed that Murie was "not a student", when, in fact, he was currently registered for a class offered later in that term. Defendant WHITE, in turn, forwarded this falsity-laden email to the Traverse City Police Department with the intent that it should be relied upon to pursue a criminal prosecution for "trespass" against Plaintiff.

52.     The Defendant NMC BOARD OF TRUSTEES, upon information and belief, approved and ratified the decision to make these false statements to the Traverse City Police Department and the Grand Traverse County Prosecutor and to press charges for trespass against Plaintiff.

53.     Defendant NMC continued to press charges against Plaintiff for "trespass" by reason of his presence on campus on November 1st, and continued to advance the position that he was in "violation" of the nonexistent "no trespass order" and "threatening behavior" at the meeting.

54.     There was never any "no-trespass order" in place against Plaintiff as of November 1st. NMC's policies require that, in order to be effected, a "no trespass" order must be in writing and must be appealable by the person to whom it is directed. Plaintiff, immediately attempted to challenge the supposed "no trespass" order through this process, but on November 8, 2019, NMC Vice-president Vicki Cook responded that the order was through the Traverse City Police Department and, therefore, could not be challenged through the college appeals processes. The Traverse City Police Department's Chief, however, later wrote that it lacked authority to issue no trespass orders for the College. Therefore, the supposed "no trespass order" could not have

originated through the TCPD. There was never any "no trespass order" in place against Plaintiff as of November 1, 2019.

55.     Shortly following his arrest, Plaintiff met with arresting officer Bock and presented documents showing his enrollment and legal status as a student, He was informed to present these document to the prosecutor's office.

56.     On December 12, 2019, plaintiff contacted the Traverse City police Chief, Jeffrey O'Brien The Plaintiff stated that it was indisputable from the video evidence that the college agents had lied to the police during my arrest. He also expressed concern that his father had been left unattended as a vulnerable adult.

57.     On December 13, 2019 Chief O'Brien. sent a letter to the plaintiff and sent a copy to the prosecutor's office. In this letter he states the Traverse City Police Department, lacked authority to issue any no trespass orders for the College. Therefore, the supposed "no trespass order" could not have originated through the TCPD. There was never any "no trespass order" in place against Plaintiff on November 1, 2019. He also wrote that he has forwarded plaintiff's evidence of false statements to the Chief Prosecutor for his review and decision on what charges "he will or won't apply to the Security guards." This letter was marked "Reviewed" by the Prosecutor's office on Jan. 7, 2020.

58.     In the Spring of 2000 the Plaintiff applied for another survey assignment with the US Census Bureau as a field agent. On August 4, 2020, he was denied the position after a background check showed charges pending for "invasion of privacy." by reason of the November 1st arrest for "trespassing".

59.     Nearly one year after the foregoing was made known to the Grand Traverse County Prosecutor, not until December 4, 2020, did it file a *nolle prosequi* because "further investigation

revealed that the People are unable to prove beyond a reasonable doubt that the trespass warning was properly given."

*The "Red Flag" Investigation*

60.    In or about August of 2021, Plaintiff successfully petitioned for a position with the Student Government Association upon a platform of records accountability and the rescission of changes to their Constitution and college policy which make non-academic students "second-class citizens". He was elected Secretary of the SGA by his fellow members..

61.    In or about October of 2021, the college put up a "three wishes" poster wherein students were invited to write three wishes that they had for the school. Plaintiff wrote "I wish NMC would follow their own policies that protect civil liberties," "I wish NMC administrators & staff would answer questions without having to file a Freedom of Information Act request" and "I wish that the new President, Mr. Nissley, will clean up the malfeasance and dereliction of duty of NMC VP's and staff. PS, help SGA!"

62.    Defendant WHITE acting, upon information and belief, with the approval and ratification of the Defendant NMC Board, contacted the Traverse City Police Department and reported Plaintiff for writing this message on the banner. He proceeded to press the TCPD to charge Plaintiff with malicious destruction of property. The TCPD resisted WHITE's pressure to charge Plaintiff with malicious destruction, based upon his participation in the "three wishes" banner. Thwarted, WHITE and the Defendant NMC BOARD then began looking for a different pretext to once again weaponize the Traverse City Police and Grand Traverse Prosecutor's Office against Plaintiff.

63.     As a member of SGA, Plaintiff continued to advance his concerns with (1) revision of definition of "student" in November 2019, (2) allocation of student fees paying for "student radio," even though it's being run as a marketing department at that point and (3) the maintenance of accurate records and minutes. Plaintiff continued to advance these concerns in meetings with the SGA, and through communications media for the SGA. As Secretary he kept meeting minutes and notes of other members positions on issues and items of business. It is important to note that these weekly meetings were exclusively remotely conducted on Zoom.

64.     On the morning of February 4th, the SGA president abruptly, and without the authority to do so, cancelled the day's scheduled weekly meeting due to tensions inside the organization. A survey was designed for the members to take, it included questions about individuals feeling of safety and their interest in pursuing the Plaintiff's concerns as a body.

65.     On or about February 7, 2021 Kenneth Berkstresser, a fellow member of the SGA, initiated a "red flag" complaint against Plaintiff. He claimed that Plaintiff was harassing, threatening, insulting and mocking him and the other SGA members, because Plaintiff continued to protest and raise his concerns noted above.

66.     Plaintiff's contact with SGA members was limited to (1) contact through Zoom meetings, or (2) emails and (3) through a "Discord" chat server set up for SGA members to communicate regarding SGA business. Though Plaintiff was a strong advocate and defender for his points of concerns, he never, in any way, shape, or form threatened or intimidated any member of SGA.

67.     "Red flag" complaints are a procedure laid out in NMC's policies and procedures. They are supposed to be reserved for *genuine* threats or violations of the Student Code of Conduct, *not* to suppress students' free speech and expression.

68.     Mr. Berkstresser's "red flag" complaint was investigated by Defendants LEANNE BAUMLER and MARCUS BENNETT. Defendants BAUMLER and BENNETT determined through their investigation that Plaintiff had, in fact, *violated the student code of conduct* and therefore recommended *disciplinary sanctions* against him including (1) permanent exclusion from participation in the SGA and (2) academic sanctions.

69.     Defendant TODD NEIBAUER reviewed the report of the incident and therefore knew or should have known that the "harassment" Murie was accused of consisted of advocating concerns to the SGA. NEIBAUER nevertheless approved and ratified BAUMLER and BENNETT'S decision to impose sanctions against Plaintiff because of his ongoing advocacy described above. NEIBAUER went so far as to find that, because Plaintiff continued to advocate his points *during SGA meetings and in SGA communications,* he had engaged in "interference by force, threat, harassment, or duress with an individual's personal safety, academic efforts, employment, or participation in college sponsored activities and/or creating a reasonable apprehension that such interference is about to occur. This includes stalking." The sanctions NEIBAUER approved included "[e]xclusion from extracurricular activities for a period of one year ending on February 7, 2023," permanent restriction from participation in the Student Government Association (SGA) and any activities/classes connected to WNMC," and an order to "have no contact with the current members of SGA."

70.     The Code of Conduct proscribes a procedure wherein a student who suffers discipline as a result of a "red flag" investigation may appeal the decision to a College Review Board. Plaintiff proceeded to do so. Defendant TONY JENKINS was the chair of Plaintiff's College Review Board and Defendant CHAD SCHENKELBURGER was the other faculty member. /The third member of the Review Board was a student.

71.     During the review process, Plaintiff repeatedly complained that the imposition of discipline was flagrantly in retaliation for his First Amendment protected advocacy, as well as retaliation for his earlier and ongoing complaints. Plaintiff also complained that NEIBAUER was not a fair and unbiased decision maker.

72.     On May 24, 2022 Defendants JENKINS and SCHENKELBURGER nevertheless voted to uphold the discipline against Plaintiff.

### Count I: First Amendment Retaliation
### 42 USC § 1983
### *As against All Defendants*

73.     In order to prevail on a claim of First Amendment Retaliation Plaintiff must prove (1) that he "engaged in constitutionally protected conduct," (2) "an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010).

74.     Plaintiff engaged in the following activities protected by the First Amendment of the United States Constitution:

    a.  Filing suit in the 13th Circuit Court alleging violation of his First Amendment Rights in or about April of 2019.

    b.  Writing his "three wishes" on the student banner in or about October of 2019, which sought accountability and redress of the ongoing improprieties by NMC's Board and administration.

    c.  Seeking to address the Student Government Association about his ongoing concerns regarding (1) funding of the ostensibly student radio station with student

funds, (2) alteration of the definition of "student" to exclude certain students from SGA involvement.

d.  Attempting to attend the SGA meeting on November 1, 2019.

e.  Seeking and securing appointment to the SGA in August of 2021.

f.  Speaking to the SGA about matters of public concern, including (1) funding of the ostensibly student radio station with student funds, (2) alteration of the definition of "student" to exclude certain students from SGA involvement, throughout 2021-2022 school year.

75.  Defendants took the following adverse actions against Plaintiff:

a.  Defendant WHITE caused Plaintiff's arrest based upon a series of knowingly false and inaccurate statements on or about November 1, 2019.

b.  Defendant KOLAK authored an email which was reviewed, approved, and ratified by Defendants WHITE and NEIBAUER which contained and amplified the false statements upon which Plaintiff's criminal prosecution was based. Each of these individual approved and ratified the decision to advance criminal prosecution based on these false statements.

c.  The Defendant NMC BOARD OF TRUSTEES, upon information and belief, approved and ratified the decision to advance a criminal claim against Plaintiff based upon this series of false and inaccurate representations.

d.  Defendants BAUMLER and BENNETT maintained a "red flag" investigation against him, based upon his involvement in and advocacy to the SGA and, ultimately, recommended disciplinary sanctions against him based upon his activities in the SGA.

    e.   Defendant NEIBAUER recommended disciplinary sanctions, including a *lifelong ban* from participation in the SGA and WNMC-FM  as a result of the red flag investigation.

    f.   Defendants JENKINS and SCHENKELBURGER, in their positions on the College Review Board, approved and ratified the decision to impose discipline against Plaintiff including lifelong ban from participation in the SGA and academic sanctions.

76.    Each of the aforesaid actions could deter a person of ordinary firmness from engaging in the actions that Plaintiff did.

77.    There is a causal connection between Plaintiff's protected conduct identified herein and the adverse actions Defendants took against him.  In way of example and not limitation,

    a.   On its face, the November 2019 "trespassing" arrest and prosecution was due to Plaintiff's protected First Amendment activity in attempting to address concerns to the SGA during their meeting.

    b.   On its face, the "red flag" investigation was because of Plaintiff's First Amendment activities of affiliating with the SGA and advancing his concerns in SGA business.

78.    A conspiracy claim under § 1983 requires allegations of: (1) a single plan; (2) in which each defendant shared a general conspiratorial objective; and (3) the commission of an overt act in furtherance of the conspiracy, causing injury. *Hooks v. Hooks*, 771 F.2d 934, 944 (6th Cir. 1985). The foregoing represents a concerted effort between Defendant WHITE, KOLAK, NEBAUER, BAUMLER, BENNET, JENKINS, SCHENKELBURGER, and the NMC BOARD

OF DIRECTORS to harass, threaten, and intimidate Plaintiff against continuing to exercise his First Amendment Rights.

79.     In *Monell v. New York City Dept. of Social Services,* 436 US 658, 691 (1978) the Supreme Court concluded that municipal liability under 42 USC § 1983 is limited to deprivations of federally protected rights caused by action taken "pursuant to official municipal policy of some nature." The deprivation of Plaintiff's rights was pursuant to and in conformance with a demonstrable policy and practice at Northwestern Michigan College to deny and suppress dissent and unpopular opinion against individuals in general and Plaintiff in particular. From the moment in 1991 when administrators threatened WNMC volunteers and the station should they continue to exercise their first amendment rights, to Plaintiff's termination from his position as a disc jockey with WNMC for continuing to advocate and affiliate with the group seeking an increase in broadcast power, to the College's decision in 2019 to have Plaintiff arrested and charged for "trespass" based on knowingly false statement, and the Red Flag decision in 2022 NMC has consistently abused its power to silence dissent.

80.     In *Pembauer v. City of Cincinnati*, 475 US 469 (1986) the Supreme Court abrogated *Monell* by holding that when an "ultimate decision maker" in a municipal organization is involved in the deprivation, or when that "action is directed by those who establish government policy" the municipality will be liable for the actions. *Pembauer,* in fact, held that a municipal organization could be held vicariously liable because a Sheriff was personally involved in the unconstitutional acts complained of. Defendant WHITE, as the Chief of Security for Defendant NMC, was the "ultimate decision maker" with respect to campus security concerns. He therefore was the ultimate decision maker behind the decision to arrest Plaintiff and seek prosecution for "trespassing," despite his knowledge that there was no "no trespassing order" in place.

Therefore, Defendant NORTHERN MICHIGAN COLLEGE is vicariously liable for the violation of Plaintiffs' First Amendment Rights, pursuant to 42 U.S.C. § 1983.

81.     Plaintiff has suffered damages, as more fully laid out before, including but not limited to:

      a.  Lost wages from the position with the US Census that resulted from his wrongful arrest and criminal charge,

      b.  Humiliation, outrage, anger, emotional distress and frustration as a result of Defendant's wrongful actions outlined herein,

      c.  Losses to his character and reputation as a result of the foregoing actions,

      d.  Losses of personal friendships as a result of the actions described herein, and

      e.  Attorney's fees and court costs in opposing Defendants' unlawful violation of his rights.

82.     Due to the flagrant, willful, and wanton violation of Plaintiff's rights he is also entitled to an award of punitive and exemplary damages pursuant to applicable law.

**Count II: Malicious Prosecution**
**42 USC § 1983**
***As against Defendants White, Kolak, Neibauer and NMC Board of Trustees***

83.     When a § 1983 malicious prosecution claim is premised on a violation of the Fourth Amendment, a plaintiff must show (1) that a criminal prosecution was initiated against him and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that the plaintiff suffered a deprivation of liberty as a result of the prosecution; and (4) that the prosecution was resolved in his favor. *Sykes v. Anderson*, 625 F.3d 294, 308-309 (6th Cir. 2010). "[T]he fact that [defendant

officers] did not make the decision to prosecute does not per se absolve them from liability." *Id.* at 311.

84.    Here, and as noted previously, Plaintiff was criminally prosecuted for "trespass" on the Northwestern Michigan College campus the day of November 1, 2019. This prosecution was influenced by false statements by Defendant WHITE which were amplified by Defendant KOLAK and approved and ratified by Defendant NEIBAUER. This was all done, upon information and belief, at the approval and ratification of the Defendant NMC BOARD OF TRUSTEES

85.    There was a lack of probable cause for the criminal prosecution. Plaintiff did not "bang on the door" or "threaten or menace students" at the meeting and these characterizations were plainly inaccurate. Further, there was no "no trespass order" in place on the day in question and the Defendant's various statements to the Traverse City Police Department and Grand Traverse Prosecuting Attorney were knowingly false and inaccurate.

86.    Plaintiff suffered multiple violations of his liberty as a result of the prosecution. He was arrested and jailed the day of November 1, 2019. He was subjected to a continuous, wrongful prosecution for criminal trespass. This cost him attorney's fees in defending himself. It caused severe emotional distress. It also cost him another assignment as a field agent at the US Census Bureau that he applied for, and was denied because of the pending criminal charge.

87.    The prosecution resolved in Plaintiff's favor, when the Grand Traverse County Prosecutor filed a file a *nolle prosequi* because "further investigation revealed that the People are unable to prove beyond a reasonable doubt that the trespass warning was properly given."

88.    As noted previously, a conspiracy claim under § 1983 requires allegations of: (1) a single plan; (2) in which each defendant shared a general conspiratorial objective; and (3) the

commission of an overt act in furtherance of the conspiracy, causing injury. *Hooks*, 771 F.2d at 944.

89.     Here, Defendants WHITE, KOLAK, NEIBAUER and the NMC BOARD OF TRUSTEES engaged in a single plan to retaliate against Plaintiff for being an "agitator" by subjecting him to a criminal prosecution in bad faith and based upon knowingly inaccurate statements.

90.     Plaintiff has suffered damages, as more fully laid out before, including but not limited to:

    a.  Lost wages from the position with the US Census that resulted from his wrongful arrest and criminal charge,

    b.  Humiliation, outrage, anger, emotional distress and frustration as a result of Defendant's wrongful actions outlined herein,

    c.  Losses to his character and reputation as a result of the foregoing actions, and

    d.  Attorney's fees and court costs in opposing Defendants' unlawful violation of his rights.

91.     Due to the flagrant, willful, and wanton violation of Plaintiff's rights he is entitled to an award of punitive and exemplary damages pursuant to applicable law.

<u>**Count III: Malicious Prosecution**</u>
**Common Law of the State of Michigan**
***As against Defendants White, Kolak, Neibauer and the NMC Board of Trustees***

92.     A malicious prosecution claim under Michigan law requires a Plaintiff to prove (1) a defendant began a criminal prosecution against the plaintiff, (2) the criminal proceeding terminated in the plaintiff's favor, (3) the defendant lacked probable cause to begin or maintain the prosecution, and (4) the defendant acted with malice or with a purpose other than bringing

the offender to justice. *Matthews v. Blue Cross and Blue Shield of Mich.*, 456 Mich. 365, 378 (1998).

93.     Here, Plaintiff was criminally prosecuted for "trespass" on the Northwestern Michigan College campus the day of November 1, 2019. This prosecution was influenced by false statements by Defendant WHITE which were amplified by Defendant KOLAK and approved and ratified by Defendant NEIBAUER.

94.     There was a lack of probable cause for the criminal prosecution. Plaintiff did not "bang on the door" or "threaten or menace students" at the meeting and these characterizations were plainly inaccurate. Plaintiff was in fact an enrolled student, Further, there was no "no trespass order" in place on the day in question and the Defendant's various statements to the Traverse City Police Department and Grand Traverse Prosecuting Attorney were knowingly false and inaccurate.

95.     Plaintiff suffered multiple violations of his liberty as a result of the prosecution. He was arrested and jailed the day of November 1, 2019. He was subjected to a continuous, wrongful prosecution for criminal trespass. This cost him attorney's fees in defending himself. It also cost him a job at the US Census Bureau that he applied for, and was denied because of the pending criminal charge.

96.     The prosecution resolved in Plaintiff's favor on December 3, 2020, when the Grand Traverse County Prosecutor filed a file a *nolle prosequi* because "further investigation revealed that the People are unable to prove beyond a reasonable doubt that the trespass warning was properly given."

97.     The elements of a cause of action for civil conspiracy in Michigan are (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose or a

lawful purpose by criminal or unlawful means (4) causing damage to the plaintiff. *Fenestra, Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 593 (1966); *Mays v. Three Rivers Rubber Corp.*, 135 Mich. App. 42, 48 (1984). In a civil conspiracy, the agreement to do the unlawful act is the thing which must be proved, but "[d]irect proof of agreement is not required . . . nor is it necessary that a formal agreement be proven." *Temborius v. Slatkin*, 157 Mich. App. 587, 600 (1986). Instead, circumstantial evidence can establish the conspiracy. *Id. See also National City Bank v. Syatt Realty Group, Inc.*, No. 07-CV-12438, at *11 (E.D. Mich. Jan. 3, 2011) (citing same with approval)

98.     Here, Defendants WHITE, KOLAK, NEIBAUER and the NMC BOARD OF TRUSTEES engaged in a single plan to retaliate against Plaintiff for being an "agitator" by subjecting him to a criminal prosecution in bad faith and based upon knowingly inaccurate statements.

99.     Plaintiff has suffered damages, as more fully laid out before, including but not limited to:

    a.  Lost wages from the position with the US Census that resulted from his wrongful arrest and criminal charge,

    b.  Humiliation, outrage, anger, emotional distress and frustration as a result of Defendant's wrongful actions outlined herein,

    c.  Losses to his character and reputation as a result of the foregoing actions, and

    d.  Attorney's fees and court costs in opposing Defendants' unlawful violation of his rights.

100.    Due to the flagrant, willful, and wanton violation of Plaintiff's rights he is entitled to an award of punitive and exemplary damages pursuant to applicable law.

**WHEREFORE** Plaintiffs demand the following relief:

1. INJUNCTIVE RELIEF requiring the Defendants, and each of them, to cease any further

    violations of Plaintiff's constitutional rights,

2. COMPENSATORY DAMAGES in an amount determine to be appropriate by the jury,

3. EXEMPLARY DAMAGES in an amount determined appropriate by the jury,

4. PUNITIVE DAMAGES in an amount determine appropriate by the jury,

5. ATTORNEYS FEES and COSTS, pursuant to statute,

6. Pre and post judgment interest,

7. Such other relief as this Court may deem appropriate in law or equity.

**PLAINTIFF DEMANDS A JURY TRIAL**

Respectfully Submitted,

Dated: 11/11/2022                                 ____/s/ Collin H. Nyeholt_____
                                                 Collin H. Nyeholt (P74132)
                                                 Attorney for the Plaintiff