UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CLIFTON MURIE, ) | |
|     Plaintiff, ) | |
| ) | No. 1:22-cv-1054 |
| v. ) | |
| ) | |
| ) | Honorable Paul L. Maloney |
| NORTHWESTERN MICHIGAN ) | |
| COLLEGE, et al., ) | |
|     Defendants. ) | |
| ) | |

## ORDER RESOLVING MOTIONS TO DISMISS

This matter comes before the Court on Defendants' motions to dismiss. (ECF Nos. 8 & 9). Plaintiff responded to each motion, (ECF Nos. 10 & 11) and Defendants filed replies. (ECF Nos. 12 & 13). The Court will grant in part Defendants' motions.

### I. Background

This action represents the cumulation of a decades-long gripe between Plaintiff, Mr. Clifton Murie and Northwestern Michigan College ("NMC"). Plaintiff filed a twenty-seven-page complaint wherein he alleges one count of First Amendment retaliation pursuant to 42 U.S.C. 1983, one count of malicious prosecution pursuant to 42 U.S.C. 1983, and one count of malicious prosecution under Michigan common law. (ECF No. 1 at PID 18–24). Plaintiff sued NMC; the Board of Trustees for NMC; Jim White, the Director of Security for NMC; Paul Kolak, an NMC administrator; Tony Jenkins, a faculty member at NMC; Todd Neibauer, Vice President for Student Services and Technologies at NMC; Leanne Baumeler, the Disability Support Coordinator for NMC; Marcus Bennet, Associate Dean

1

of Campus Life for NMC; and Chad Schenkelberger, a faculty member at NMC. (ECF No. 1 at PID 2-4). Plaintiff's complaint does not specify whether he is suing the Defendants in their individual or specific capacities. *Id.*

The following allegations are taken from Plaintiff's complaint. (ECF No. 1). Plaintiff began his academic career at NMC in the fall of 1984. According to Plaintiff, his troubles began with a grade dispute stemming from his enrollment in a nursing program in December of that year. This matter "turned highly contentions" and culminated in Plaintiff involving the Student Government Association ("SGA") to review the "Due Process System" at NMC. (*Id.* at 4).

In 1985, NMC cancelled an interview with Plaintiff regarding a course proposal that he submitted for instructing parents in "Infant Massage." (*Id.* at 4). Apparently, NMC would later seek out female massage therapists from the community to teach the class he had designed and presented to the college. Plaintiff filed an EEOC charge alleging sex discrimination.

During that same timeframe, Plaintiff would get involved with NMC's student radio station, WNMC-FM ("WNMC") where he would become the general manager. Plaintiff became "embroiled in a dispute" about whether the radio station should apply for FCC approval to increase the power and range of the station. According to Plaintiff, his actions led to an NMC administrator threatening to "pull the plug" on the entire radio program. In January 1993, Plaintiff was removed from his radio program by college security, ordered to leave campus or be arrested, and banned from the station. In May of 1993, Plaintiff was permanently suspended from the station. In 2002, Plaintiff filed an FCC complaint "about

2

the deficiencies in WNMC's practices as a non-commercial broadcaster." (ECF No. 1 at PID 6). In response, NMC's president said, "every time Plaintiff comes to campus, it is a security incident." *Id.*

In November of 2004, Plaintiff was removed from the staff of the college newspaper. Plaintiff would be denied a hearing after he filed a discrimination complaint regarding the matter. NMC denied his request because he was a "non-academic" student.

In 2011, Plaintiff entered an SGA meeting after college security attempted to block him from doing so. The security staff followed Plaintiff into the room and threatened to arrest him if he did not leave. The Traverse City police were called to respond and Defendant White, NMC's head of security, issued Plaintiff a verbal "No Trespassing order" for one year. NMC claimed that Plaintiff had intimidated students with his presence because the students were worried Plaintiff had a gun in his backpack. Plaintiff denies he had a gun.

On November 8, 2018, Plaintiff visited NMC's presidential office to "review WNMC's Public Inspection File." When he entered the office, the then WNMC general manager, Eric Hines, "immediately *assaulted* Plaintiff by grabbing him by the arms and shoving him backwards towards the door." (ECF No. 1 at PID 8) (emphasis in original). Plaintiff reported the alleged assault to the college but was unsatisfied with the college's ensuing investigation. Plaintiff would file a police report regarding the incident.

In December 2018, Plaintiff contacted Trustee Chairman Kennard Weaver by email to complain about his 1993 removal from WNMC. On January 11, 2019, President Tim Nelson told Plaintiff his ban was lifted and on February 14, 2019, Plaintiff applied to

3

be a volunteer at WNMC. Plaintiff's request was denied by general manager Eric Hines, and Hines allegedly circulated an email indicating Plaintiff was a threat. Plaintiff's denial sparked Plaintiff's poster campaign; Plaintiff would post "satirical 'Wanted' poster[s] on NMC's public bulletin boards as a protest to the decision to exclude him as a volunteer and his instruction that volunteers treat him as a threat." (ECF No. 1 at PID 9). Plaintiff then reached out to the SGA president at the time, Emily Perkins. Ms. Perkins ignored his calls and emails.

On April 1, 2019, Plaintiff ventured to the college president's office to complain about the removal of his posters. Plaintiff maintains that the conversation was peaceful, but the administration called the Traverse City Police Department ("TCPD") and "discussed the issuance of a 'No trespassing' order." (ECF No. 1 at PID 10).

On April 5, 2019, Plaintiff was still enrolled as a non-academic student and sought to attend the weekly SGA meeting. Defendant White and several TCPD officers informed Plaintiff that a 90 day no trespass order was being issued to him for his April 1 appearance at the NMC president's office. Plaintiff received written notice on April 8. Plaintiff would go on to file a *pro se* lawsuit in state court regarding his posters and the no trespass notice, which he would later dismiss on May 21, 2019. That no trespass notice concluded around July 2019.

As of October 23, 2019, Plaintiff was registered for a single class at NMC, "How to Start a Nonprofit." NMC staff refused his requests to contact SGA; staff would not tell Plaintiff SGA's place or time of meeting. On November 1, the NMC SGA convened to discuss eliminating all non-academic student's ability to attend SGA meetings or offer input

4

at them. Plaintiff arrived at the meeting to find a locked door. Plaintiff says he knocked once and politely stood outside the door waiting. After approximately ten minutes, Defendant White informed Plaintiff that he had been issued another "no trespassing" notice, this time for six months. Plaintiff then call the police. TCPD officers arrived, and one officer spoke with Mr. White. White told the Officers that Plaintiff was making a scene and scaring the students. The officers told Plaintiff that if he did not leave campus, he would be arrested. Plaintiff was arrested for trespassing. Plaintiff alleges that Mr. White lied to TCPD officer Bock and had told him Plaintiff was banging on the door.

On the same day, "Defendant Paul Kolak authored an email to Defendants White and Todd Neibauer which falsely accused Plaintiff of 'pounding on the classroom window and rattling the locked door handle' causing students to be 'concerned about their guest speaker's safety.'" (ECF No 1. at PID 13). Mr. Kolak also allegedly claimed that Plaintiff "was 'not a student', when, in fact, he was currently registered for a class offered later in that term." *Id.* Defendant White supposedly forwarded this email to the TCPD "with the intent that it should be relied upon to pursue a criminal prosecution for trespass against Plaintiff." *Id.* Plaintiff argues that the NMC Board of Trustee, "upon information and belief," approved of the email and agreed to press trespass charges against Plaintiff. Nearly a year later, the charges were dropped on December 4, 2020. Plaintiff alleges he lost a job opportunity with the United States Census bureau while the charges were pending.

In August of 2021, Plaintiff petitioned and received the position of secretary of the SGA. By October, another incident arose. NMC had put up "three wishes" posters where students were invited to write their wishes for the school. Plaintiff's wishes included the

5

following: "I wish NMC would follow their own policies that protect civil liberties," "I wish NMC administrators & staff would answer questions without having to file a Freedom of Information Act request," and "I wish that the new President, Mr. Nissley, will clean up the malfeasance and dereliction of duty of NMC VP's and staff. PS, help SGA!" (ECF No. 1 at PID 15). Defendant White then called the TCPD and allegedly urged the officers to arrest Plaintiff for malicious destruction of property. Plaintiff was not arrested.

On February 4, the SGA president cancelled the scheduled weekly meeting due to rising tensions within SGA. On or about February 7, 2021, Kenneth Berkstresser, another member of the SGA, initiated a "red flag" complaint against Plaintiff. He claimed that Plaintiff was harassing, threatening, insulting, and mocking him and the other SGA members. Plaintiff denies these allegations and avers his only contact with other SGA members was through zoom meetings, emails, and through a "discord" chat.

The red flag complaint against Plaintiff was investigated by Defendants Leanne Baumeler, the Disability Support Coordinator for NMC and Marcus Bennet, the Associate Dean of Campus Life for NMC. Their investigation determined that Plaintiff "had, in fact, *violated the student code of conduct* and therefore recommended *disciplinary sanctions* against him including (1) permanent exclusion from participation in the SGA and (2) academic sanctions." (ECF No. 1 at PID 17). Defendant Neibauer approved their findings. Plaintiff was excluded from extracurricular activities until February 7, 2023, permanently removed from SGA, and ordered to have no contact with SGA. Plaintiff appealed to Defendants Tony Jenkins and Chad Schenkelberger, who sat on NMC's review board

along with a student. On May 24, 2022, the review board voted to uphold the discipline against Plaintiff.

## II. Legal Standards

Defendants NMC, the NMC Board of Trustees, Baumeler, Bennett, Kolak, Neibauer, Jenkins, and Schenkelberger moved under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiff's complaint. (ECF No. 8). Defendant White filed his own motion to dismiss pursuant to 12(b)(6). (ECF No. 9). The motions mirror each other.

A. 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for the lack of subject matter jurisdiction. A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack). *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994)). A factual attack challenges the factual existence of subject matter jurisdiction. *Cartwright*, 751 F.3d at 759. "In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Id.* at 759–60. When reviewing a factual attack on its jurisdiction, "no presumptive truthfulness applies to the

7

factual allegations." *Absolute Mach. Tools, Inc. v. Clancy Mach. Tools, Inc.*, 410 F. Supp. 2d 665, 668 (N.D. Ohio 2005).

Defendants moved to dismiss Plaintiff's complaint, in part, on grounds of sovereign immunity. "A motion to dismiss on the ground that sovereign immunity bars the plaintiff's claims is properly treated as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)." *Odom v. Univ. of Mich.*, 2017 WL 2117978, at *2 (E.D. Mich. May 16, 2017). *See also Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 476 (6th Cir. 2006).

B. 12(b)(6) Standard

A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). To survive a motion to dismiss, a plaintiff must allege facts sufficient to state a claim for relief that is "plausible on its face" and, when accepted as true, are sufficient to "raise a right to relief above the speculative level." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). "The complaint must contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015). To resolve a motion to dismiss under 12(b)(6), a court must accept as true all factual allegations, but it need not accept any legal conclusions. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011).

### III. Analysis

Defendants' two motions to dismiss are largely synonymous with one another. Plaintiff's First Amendment retaliation claim was brought against all Defendants. Both of Plaintiff's malicious prosecution claims were brought against Defendants White, Kolak, Neibauer and the NMC Board of Trustees. As explained below, only the federal malicious prosecution claim will survive against Defendants White, Kolak, and Neibauer.

A. Sovereign Immunity

Defendants first argue that sovereign immunity requires dismissal of all three claims against NMC and the individual NMC defendants in their official capacities. Plaintiff argues the opposite and maintains that NMC—like other community colleges—are "political subdivisions" that do not enjoy Eleventh Amendment Immunity. A state agency may invoke the state's Eleventh Amendment immunity if it will protect the state treasury from liability that would essentially operate as a judgment against the state itself. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 123 (1984). By contrast, Eleventh Amendment immunity does not extend to independent political subdivisions such as counties or cities. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). The Court's first inquiry is whether Michigan community colleges are "an arm of the state of Michigan" and enjoy sovereign immunity, which is an open question in the Sixth Circuit.

Whether a Michigan community college is an arm of the state or a municipal entity "is often a close question which depends on the particular funding structure and measure of local autonomy of the community college in question." *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x. 429, 438 n. 5 (6th Cir. 2006). State universities typically enjoy Eleventh Amendment immunity. *See, e.g., McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir.

9

2012); *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533 (2002); *Robinson v. Univ. of Akron School of Law*, 307 F.3d 409 (6th Cir. 2002). "However, community and technical colleges tend to present more difficult questions because they are most often hybrids of state and local entities." *U.S. ex rel Diop v. Wayne Cnty. Cmty. Coll. Dist.*, 242 F. Supp. 2d 497, 526–27 (E.D. Mich. 2003). Courts typically look to the degree of local autonomy as well as whether the funds to pay any award would come from the state treasury. *Id.*

In *Diop v. Wayne County Community College District*, a court in the Eastern District of Michigan held that Wayne County Community College District ("WCCCD") was an arm of the state. 242 F. Supp. 2d at 527–28. That court found that because state "funding amounts to more than 1/3 of WCCCD's revenues, it is inescapable that any damage award would, by necessity, invade the state treasury, at least in part." *Id.* Additionally, the court cited Michigan's Community College Act of 1966, M.C.L. 389.1, *et seq*, as evidence that the community college was subject to a "comprehensive state authority scheme." *Id.*

This issue was addressed again by the Eastern District in *Boensch v. Delta College*, and the court reached the opposite conclusion. No. 10-10120-BC, 2011 WL 1233301, at *8 (E.D. Mich. Mar. 30, 2011). The court discredited the reasoning in *Diop*, explaining that "the fact that some of the money used to pay a judgment would come from the State does not mean the State is potentially liable for the judgment." *Id.* "Some indirect impact on the State Treasury," the court explained, was not the same as a judgment against the state. *Id.* The court also observed that while the Michigan legislature has the authority to establish a community college system, the legislature also chose to "delegate much of the authority for the creation, management, and funding [of] community colleges to local or regional

10

authorities." *Id.* Additionally, the court found that local boards exercise substantial control over all aspects of local community college. *Id.* Further, the purpose of community colleges—fostering local education—was local in nature. *Id.* at 9. The court held that community colleges are "political subdivisions" and not arms of the state.[1] *Id.*

Here, NMC is a publicly funded community college and is organized under the Michigan Community College Act, MCL § 389.1, *et seq.* NMC's position is largely analogous to the community college's position in *Boensch*. The Court adopts the reasoning in *Boensch* and will not follow the cursory reasoning in *Diop*. There is no evidence to suggest that a judgment for Plaintiff and against NMC could be used to reach the state's coffers. NMC is at least in part, a local entity and subject to municipal control. NMC primarily serves a local function. NMC is not an arm of the state, and therefore, does not enjoy sovereign immunity under the Eleventh Amendment.

B. Statute of Limitations

Next, Defendants argue that Plaintiff's claims are time-barred. Constitutional claims asserted under 42 U.S.C. 1983 are governed by the state personal injury statute of limitations. *Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007). In Michigan, the statute of limitations period is generally three years. *See* MCL 600.5805(2).

Plaintiff acknowledged the three-year limitation and explained that his retaliation claim is "based on the 'red flag' investigation which concluded on or about May 24, 2022." (ECF No. 10 at PID 141). Therefore, any alleged harm that took place prior to three years

---

[1] The *Boensch* opinion cited *Lansing Cnty. Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, which found that a Michigan community college was not an arm of the State of Michigan for purposes of diversity jurisdiction. 681 F. Supp. 2d 868, 869 (W.D. Mich. 2010).

11

before the date Plaintiff filed his complaint, November 11, 2022, cannot be considered by the Court. The Court will only consider facts from after November 11, 2019, for the First Amendment retaliation claim. This framework will be applied below.

As it relates to the malicious prosecution claims, Michigan's statute of limitations for malicious prosecution is two years. *See* MCL 600.5805(7). Generally, the statute of limitations for a plaintiff's malicious prosecution claim starts to run when a "plaintiff [is] acquitted." *Fox*, 489 F.3d at 233. Here, the prosecutor dropped the charges against Plaintiff on December 4, 2020. Plaintiff had until December 4, 2022, to assert his malicious prosecution claims; he filed his complaint on November 11, 2022. Therefore, Plaintiff's malicious prosecution claims were timely.

C. Plausibility Regarding First Amendment Retaliation Claim.

Defendants argue that Plaintiff's claims are implausible. To properly plead a First Amendment retaliation claim, a plaintiff must plead that: (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010).

Defendants argue that Plaintiff did not engage in constitutionally protected conduct. Plaintiff's relevant speech was his concerns brought forth in the SGA meetings prior to the red flag investigation.

Not all speech in a school setting is protected by the First Amendment. *See, e.g., Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 678 (1986) (finding a student's use of a graphic

12

and explicit sexual metaphor in a speech was not protected by the First Amendment). But the speech alleged here is likely protected. Plaintiff's concerns expressed about SGA are not the type sufficient to shake First Amendment protection. Plaintiff's speech was not "offensively lewd and indecent." *Id.* at 685. Plaintiff adequately pled that he engaged in protected speech.

Defendants argue that Plaintiff's First Amendment claim fails at the second step because Plaintiff's ban from the SGA is not sufficient to deter a person of ordinary firmness from continuing to engage in his conduct. The alleged adverse actions taken after November 11, 2019, include Defendants Baumeler and Bennet's investigation into Plaintiff's behavior after receiving the red flag complaint and their recommendation to exclude Plaintiff from SGA; (2) Defendant Neibauer's agreement with the sanctions; and (3) Defendants Jerkins and Schenkelberger's ultimate ratification of the discipline upon final review in May of 2022. (ECF No. 1 at PID 19-20). Further, Plaintiff seemingly relies on Defendant White's recommendation to TCPD to arrest Plaintiff following his "three wishes" posters, which occurred in October 2021.

Plaintiff was prohibited from engaging in SGA matters and was banned from extracurricular events on campus after another student (and not a named Defendant) reported that Plaintiff was threatening and intimidating another SGA member.

"Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). That "standard is an attempt to balance the tension between two propositions: First, the injury suffered need not be great because there is no justification for

13

harassing people for exercise of their constitutional rights; but second, a constitutional tort—like any tort—requires injury, and allowing constitutional redress for every minor harassment may serve to trivialize the First Amendment." *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999). "The term 'adverse action' is drawn from employment case law; examples in that context include discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). "[W]hen a plaintiff's alleged adverse action is 'inconsequential,' resulting in nothing more than a 'de minimis injury,' the claim is properly dismissed as a matter of law." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012) (quoting *Bell*, 308 F.3d at 603, 606). The Sixth Circuit has summarized some of what can qualify as an adverse action:

> Cynthia Bloch could sue a sheriff for disclosing humiliating and confidential details of her rape in response to her criticism that the sheriff had not done enough to find the culprit. *See Bloch*, 156 F.3d at 679–80. Tom and Melanie Briner could sue the police for failing to investigate a crime in response to their criticism over how the police had investigated an earlier crime. *See Briner v. City of Ontario*, 370 F. App'x 682, 700–01 (6th Cir. 2010). Sue Fritz could sue a township official for encouraging her employer not to renew her contract in response to her comments at public meetings. *See Fritz*, 592 F.3d at 725–26. David Holzemer could sue a police officer for delaying the renewal of a permit in response to his petitioning of a city councilman. *See Holzemer*, 621 F.3d at 525. Kathleen Benison could sue college officials for filing a suit against her in response to her husband's sponsoring a vote of no confidence against them. *See Benison v. Ross*, 765 F.3d 649, 660 (6th Cir. 2014). And Frank Barrett could sue a judge for falsely telling the media that he had been "stalking" her in response to his public criticisms. *See Barrett*, 130 F.3d at 262.

*Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 514–15 (6th Cir. 2020).

Here, Plaintiff pled an adverse action. The alleged adverse actions are Defendants Baumeler and Bennet's investigation into Plaintiff's behavior after receiving the red flag

14

complaint and their recommendation to exclude Plaintiff from SGA; (2) Defendant Neibauer's agreement with the sanctions; and (3) Defendant Jerkins and Schenkelberger's ultimate ratification of the discipline upon final review in May of 2022. (ECF No. 1 at PID 19–20). (Plaintiff's November 1, 2019, arrest is time-barred for purposes of his First Amendment retaliation claim.) In the Court's view NMC's "red flag" investigation constitutes an adverse action. He was precluded from contacting the SGA and removed from the group. Plaintiff's allegations exceed delaying the renewal of a permit, and amount to concrete adverse decision. *Fritz*, 592 F.3d at 725–26. Plaintiff's exclusion from SGA resembles a "discharge." *Thaddeus-X*, 175 F.3d at 396.

Next, Defendants argue that Plaintiff did not plead a plausible causal connection as required by the third element of his retaliation claim. Here, Defendants succeed. From the complaint, Plaintiff only offers legal conclusions and no facts connecting his protected speech to the adverse action. The two listed facts include only the following:

> a. On its face, the November 2019 "trespassing" arrest and prosecution was due to Plaintiff's protected First Amendment activity in attempting to address concerns to the SGA during their meeting.
> b. On its face, the "red flag" investigation was because of Plaintiff's First Amendment activities of affiliating with the SGA and advancing his concerns in SGA business.

(ECF No. 1 at PID 20). As discussed earlier, the arrest is time-barred as it occurred more than three years before Plaintiff filed his complaint; it has no bearing on Plaintiff's retaliation claim. Plaintiff's brief in response to Defendants' motion to dismiss states, "Plaintiff's First Amendment Retaliation claim is based on the "red flag" investigation which concluded on or about May 24, 2022." (ECF No. 10 at PID 141). As to the second

15

offering, it is a mere legal conclusion, which this Court must disregard. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011).

Plaintiff did not plead facts indicating a causal connection between his protected speech and the adverse action. The court notes that the "red flag" investigation was initiated by another student and not a named Defendant. The "red flag" investigation was initiated because "Plaintiff was harassing, threatening, insulting and mocking him and the other SGA members." (ECF No. 1 at PID 16). Based on the Complaint, the investigation stemmed from Plaintiff's inappropriate conduct and not his speech. Plaintiff failed to allege facts connecting his speech to the "red flag" investigation. Therefore, Plaintiff's retaliation claim is dismissed under 12(b)(6) as to all Defendants.

D. Federal Malicious Prosecution Claim

First, Defendants argue that Plaintiff lacks standing because he cannot seek money damages against NMC because it enjoys immunity under the Eleventh Amendment. As discussed above, Defendants do not have sovereign immunity, and Defendants' argument fails.

Second, Defendants argue that Michigan law bars Plaintiff's state law malicious prosecution claim or that the individual Defendants are otherwise entitled to qualified immunity. Defendants raise these arguments in sweeping fashion and "offer no real analysis." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *Id.* 995–96. (citing *Citizens*

16

*Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n,* 59 F.3d 284, 293-94 (1st Cir. 1995). These arguments are rejected at this stage of the litigation. Defendants may bring them properly at summary judgment if needed.

To plausibly plead a malicious prosecution claim under federal law, a plaintiff must allege: (1) "that a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute"; (2) "that there was a lack of probable cause for the criminal prosecution"; (3) "that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure"; and (4) that "the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes v. Anderson,* 625 F.3d 294, 308-09 (6th Cir. 2010). As it relates to the first element, "[t]o be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Sykes,* 625 F.3d at 309 n.5.

Here, Plaintiff called the police himself after being asked to leave NMC's campus. When Plaintiff failed to comply, he was arrested. Plaintiff alleges that he was criminally prosecuted for trespass on the NMC campus, and that the prosecution was "influenced by false statements by Defendant WHITE which were amplified by Defendant KOLAK and approved and ratified by Defendant NEIBAUER." (ECF No. 1 at PID 25). According to Plaintiff, Defendant White "falsely stated to Officer Bock that Plaintiff had been 'banging on the door, and ordered to be let in.'" (*Id.* at PID 12). Finally, Plaintiff alleges that "NMC BOARD OF TRUSTEES, upon information and belief, approved and ratified the

17

decision to make these false statements to the Traverse City Police Department and the Grand Traverse County Prosecutor and to press charges for trespass against Plaintiff." (*Id.* at 13).

As it relates to the NMC Board of Trustees, Plaintiff's federal malicious prosecution claim must be dismissed. Plaintiff pled no facts indicating whether the Trustees ratified or even knew about Plaintiff's arrest. Simply alleging that "Defendant NMC BOARD OF TRUSTEES, upon information and belief, approved and ratified the decision to make these false statements to the [police]" does not pass muster under pleading standards. (ECF No. 1 at 13). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement.").

But Plaintiff did plead facts indicating that Defendants White, Kolak, and Neibauer participated in the decision to prosecute. According to Plaintiff, White told police officers false information; Kolak amplified those allegations through an internal email, which was ultimately shared with police. *See Meeks v. City of Detroit, Michigan*, 727 F. App'x 171, 178 (6th Cir. 2018) (citing Mills, 869 F.3d 473, 482 (6th Cir. 2017)) ("Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when those materials formed the basis for the charge.") Therefore, Plaintiff's federal malicious prosecution claim survives as against White, Kolak and Neibauer but not against the NMC Board of Trustees.

E. State Malicious Prosecution Claim

To succeed on a malicious prosecution claim under state law, a "plaintiff has the burden of proving (1) that the defendant has initiated a criminal prosecution against him,

18

(2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." *Matthews v. Blue Cross & Blue Shield of Michigan*, 572 N.W.2d 603, 609-10 (Mich. 1998). The Michigan Court of Appeals described the malice element as "a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based." *Chappelle v. Baybridge Cap. Advisors, LLC*, No. 330642, 2017 WL 1096783, at *3 (Mich. Ct. App. Mar. 21, 2017) (citing *Friedman v. Dozorc*, 312 N.W.2d 585, 603 (Mich. 1981). Here, Plaintiff did not allege malice in his complaint. (ECF No. 1). Therefore, Plaintiff's malicious prosecution claim under state law is dismissed as raised against all Defendants.

## Conclusion

The Court will dismiss Plaintiff's First Amendment retaliation claim under 12(b)(6). The Court will dismiss Plaintiff's state law malicious prosecution claim under 12(b)(6). Plaintiff's federal malicious prosecution claim will continue only against Defendants White, Kolak, and Neibauer. All other Defendants are dismissed from the action.

**IT IS HEREBY ORDERED** that Defendants' motion to dismiss (ECF No. 8) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss (ECF No. 9) is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

Date: February 5, 2024                             /s/ Paul L. Maloney

                                                  Paul L. Maloney  
                                                  United States District Judge